## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHADY HANAFY | CIVIL ACTION |
| Plaintiff, | No. 22-878 |
| v. | |
| HILL INTERNATIONAL, INC. | **JURY TRIAL DEMANDED** |
| Defendant. | |

## FIRST AMENDED COMPLAINT

Plaintiff, by and through his undersigned counsel, hereby avers as follows:

## INTRODUCTION

1. This action has been initiated by Shady Hanafy (hereinafter referred to as "Plaintiff," unless indicated otherwise) against Hill International, Inc. (hereinafter referred to as "Defendant") for violations of the Americans with Disabilities Act ("ADA" -42 USC §§ 12101 *et. seq.*), the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §§ 2601 *et seq.*), the Age Discrimination in Employment Act ("ADEA" - 29 U.S.C. §§ 621 *et. seq.*), Section 1981 of the Civil Rights Act of 1866 ("Section 1981" - 42 U.S.C. § 1981), Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 2000e, *et seq.*), and the Pennsylvania Human Relations Act ("PHRA"). As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2. This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under laws of the United States.

3. This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945) and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and in addition, Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the Eastern District of Pennsylvania.

5. Plaintiff is proceeding herein under Title VII, the ADEA, and the ADA and has properly exhausted his administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice of dismissal and/or right to sue letter from the EEOC. Plaintiff is also proceeding under the PHRA and has satisfied the statutory waiting period for filing such a claim. 43 P.S. § 962(c)(1).

## PARTIES

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult individual, with an address as set forth in the caption.

8. Defendant is a corporation located at the above-captioned address that engages in the business of developing and machining high-performance plastic materials.

9. At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

10. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11. Plaintiff was employed with Defendant for over 10 years (from on or about April 21, 2011 through on or about October 1, 2021).

12. At the time of Plaintiff's involuntary separation from Defendant, he was employed as a Human Resources Generalist ("HR Generalist").

13. Plaintiff is 47 years old.

14. Plaintiff is from Egypt (moved to the United States in 1997) and his race is Middle-Eastern.

15. When Plaintiff first started working for Defendant, he was working internationally in Saudi Arabia reporting to Middle East Headquarters in Dubai (under the supervision of Mrs. Naomi Williams – International HR VP, during the last few years of his employment in Saudi Arabia).

16. During his 8 years of service in Defendant's International Branch, Plaintiff was promoted twice and in 2016 and was selected as one of very few employees with Defendant worldwide (approximately 3300 employees) to have his contract amended to include an airline ticket. This was an honor given to Plaintiff based on his exceptional performance with Defendant.

17. Approximately three (3) years before his unlawful termination in October of 2021 (discussed further *infra*), Plaintiff transferred to the United States upon his request and approval of the Senior Vice President of HR, Keith Person (hereinafter "Person").

18. Upon information and belief, Person thought Plaintiff would make a great asset to the U.S. team. because of his strong work ethic and performance over the years he had been employed with Defendant.

19. Plaintiff was informed by Person that his plan was to move Plaintiff to the U.S. team in order to motivate his staff and expose them to his work ethics. Person also informed Plaintiff that he wanted Plaintiff to play an important role in linking U.S. Headquarters and International Headquarters with his experience and knowledge.

20. Based on Person's aforesaid representations, Plaintiff accepted a pay reduction and a change of title to "HR Generalist" with the understanding that once Plaintiff completed his training in the U.S., he would receive a different title and a higher pay rate.

21. Shortly after being transferred to the U.S., Person separated from his employment and Tiffany Banks (Black/American – hereinafter "Banks") assumed his position.

22. For the first approximate year of Plaintiff's employment in the U.S., he directly reported to Christen Klemp (Caucasian/American – hereinafter "CK").

23. In addition to Banks, Klemp and Plaintiff, Defendant's U.S. HR department also employed the following individuals during Plaintiff's approximate first year of employment in the U.S.: HR Director, Felicia Cream (Black/American – hereinafter "Cream"); HR Onboarding Manager (name unknown); Benefits Manager, Lisa (last name unknown – hereinafter "Lisa"); and HR Coordinator, Gabe Klemp (Caucasian/American – hereinafter "Klemp" – who was also CK's husband and therefore reported to Cream because he was unable to report to CK).

24. In or about October of 2019, Defendant hired another young female HR Generalist, Lindsay Brown (approximate 30s, Caucasian/American – hereinafter "Brown"). She was placed under Klemp and Plaintiff was then placed under a new supervisor, Cream.

25. After coming under the supervision of Klemp and Banks and while also under the supervision of Cream (and Banks), Plaintiff was subjected to constant discriminatory treatment based on his race, national origin, and advanced age.

26. For example, unlike Plaintiff's counterparts who fell outside of his protected classes:

   i. Plaintiff was constantly asked if he wanted to resign, which after so many times seemed to be more of an invitation to resign rather than a question;

   ii. Plaintiff was given a job description for an administrative level position, which consisted of a tremendous amount of tedious tasks with unrealistic and selectively enforced deadlines and which did not reflect Plaintiff's skills, qualifications and experience in HR;

   iii. With each new and time-consuming/tedious task that was added to Plaintiff's job (discussed *supra*), it became strongly apparent to Plaintiff that Defendant's management was attempting to make Plaintiff's work environment so miserable that he would quit. However, Plaintiff refused to quit and continued to work to the best of his ability to complete all his tasks in a timely manner, even having to work days, nights and during his time off (although Plaintiff did not record this time on his timesheets per Defendant's management's instructions);

iv. GK was assigned to train Plaintiff under the aforesaid administrative level job description (as it was his prior job description), while GK was given the job of HR Generalist for the U.S. Team, performing more meaningful HR-specific tasks (even though Plaintiff had more experience, seniority, qualifications and skills than GK);

v. Changes were made within the U.S. HR department to make Plaintiff's job more difficult. For example, when Plaintiff assumed the duty of "job descriptions," the timeline to enter education verifications into the system was 48 hours; however, when GK was previously assigned this task, it was 90 days. When Plaintiff complained that this change in procedure was not only challenging but unfair, he was told "it is what it is, accept it or resign."

vi. There were many issues within the U.S. HR department that Plaintiff was blamed for without reason (including some issues that occurred when Plaintiff was not even employed within the U.S. HR department);

vii. Plaintiff was often ignored, not invited to meetings and events, and treated like an outcast. For example, when Plaintiff was invited to the company New Year's party, he was not seated at the HR table;

viii. Plaintiff was consistently denied opportunities to engage in and/or take on more meaningful tasks. For example:

(1) When GK, who was responsible for the U.S. Team and had more meaningful tasks (*i.e.* more akin to that of a true HR Generalist), transferred to the IT department, Plaintiff was denied the

opportunity to replace GK and instead Defendant hired Brown to fill GK's position;

(2) When Defendant's U.S. Onboarding HR Manager resigned, Plaintiff offered to assume some of her responsibilities (as again, they were more advanced and meaningful and would have allowed Plaintiff to apply his skills and qualifications rather than perform mundane and tedious tasks); however, Plaintiff was again denied this opportunity; and

(3) When Defendant's U.S. Benefits Manager resigned and her successor was overwhelmed with tasks, Plaintiff offered to help (as again, he had the experience, skills, and qualifications to assist) but instead, those tasks were assigned to Lindsay.

ix. Plaintiff was treated in a rude and demeaning manner by Defendant's management;

x. Plaintiff had policies selectively enforced against him;

xi. Plaintiff was assigned more work than other employees within his department;

xii. Plaintiff was issued pretextual discipline and negative performance evaluations (in an apparent attempt to try and terminate his employment for discriminatory and pretextual reasons).; and

xiii. Plaintiff was subjected to discriminatory comments based on his race, national origin, and/or ethnic characteristics.

27. Some of the aforesaid discriminatory comments that Plaintiff was subjected to by Defendant's management and staff included but was not limited to being told that it was hard to understand Plaintiff because of his accent or that they could not hear Plaintiff because of his accent (even though others outside of Plaintiff's workplace could clearly understand what he was saying despite his accent), and being told "in this country" things are done different or in a certain way.

28. In addition to the foregoing, Plaintiff was also treated in a discriminatory manner based on his actual/perceived/record of disabilities.

29. Specifically, Plaintiff suffers from disabilities related to his heart, which at times interferes with his ability to perform certain daily life activities, including but not limited to lifting, performing manual tasks, and working.

30. In or about 2019, Plaintiff suffered a heart attack (which he attributed to the amount of stress he was put under at work) and was required to take a medical leave of absence.

31. When Plaintiff returned from his aforesaid medical leave of absence, he was treated in a very hostile manner, including but not limited to:

    i. Trying to issue him discipline for not calling out of work when he had been admitted to the hospital for an emergency;

    ii. Being required to lift lifting heavy packages, even though Plaintiff apprised Defendant's management and told Cream on several occasions that he should not be lifting heavy objects (as his doctor advised him not to perform strenuous activities);

    iii. During the pandemic (before July of 2021 when all employees were required to return 50% of the time), Plaintiff was often volunteered to go into the office several days a week, unlike his other co-workers. Plaintiff

8

was not in a position to object to Defendant's management requests because of their prior discriminatory/retaliatory treatment of him. After being requested to go to the office several times a week (unlike his other co-workers), Plaintiff became worried that he was there alone and that if something happened to him (related to his health), no one would be there to call 911. Plaintiff expressed these concerns to Cream, and while Plaintiff was required to go to the office less often after his conversation with Cream, he was still made to do so more than other employees.

32. Despite the continuous hostile work environment that Plaintiff was subjected to upon his return from medical leave, he continued to do as he was instructed (despite the discriminatory nature of Defendant's actions) because he needed a job, as he had a family to support in Egypt.

33. However, Plaintiff did express concerns about the aforesaid discriminatory treatment that he was being subjected to on several occasions in advance of his October 2021 termination. Unfortunately, Plaintiff's complaints fell on deaf ears and no one in Defendant's management properly investigated or resolved his concerns of discrimination and the aforesaid harassment continued.

34. In the months leading up to his separation, Plaintiff informed Defendant's management that he would be taking another medical leave in the near future to undergo bypass surgery (related to his aforesaid heart condition).

35. During these aforesaid conversations (referenced in Paragraph 34 of the instant Civil Action Complaint), Plaintiff specifically informed Defendant's management that he would

be undergoing bypass surgery once his wife was permitted to come to the U.S. under an immigration Visa.

36. Defendant's management was aware that Plaintiff's wife was coming to the U.S. the weekend of September 11, 2021 (and that as a result, he would be undergoing bypass surgery shortly thereafter).

37. On or about September 14, 2021, Plaintiff was informed by Defendant that he was being terminated from his employment due to a restructuring and that his termination date would be effective October 1, 2021.

38. Plaintiff was offered a severance agreement, which would require him to waive any and all claims that he had against Defendant (including claims under the ADA, FMLA, Title VII, and ADEA) in exchange for a small sum of money. Plaintiff rejected this proposed offer.[1]

39. A few weeks before informing Plaintiff that he was being separated from his employment, Defendant hired a young Black/American male in his 30s into the role of HR Manager (who started on September 13, 2021).

40. Upon information and belief, when Plaintiff was terminated, Defendant re-titled Brown's HR Generalist position into that of "HR Manager" as well.

41. Plaintiff holds the following HR credentials and U.S. Army Recognitions: SHRM Professional Member 01812864 - License 01812864; CIPD Assoc CIPD - License 47372062; and

---

[1] *See Karl v. City of Mountlake Terrace*, 2011 U.S. Dist. LEXIS 59085, at *13-14 (W.D. Wash. June 2, 2011) (severance agreements are admissible in retaliation claims when made contemporaneous to termination, as they are not governed by FRE 408); *Bartlett v. NIBCO Inc.*, 2011 U.S. Dist. LEXIS 28072, at *11 (N.D. Ind. March 18, 2011) ("Severance pay packages contingent upon a release of claims which are offered *contemporaneously with the notice of termination* are *not* covered by [Rule 408]," and the motive in offering same is admissible evidence in a retaliation claim and is admissible at trial in this case.) (citation omitted).

AHRI MAHRI - License 327790 and he received the following awards while he was in the U.S. Army: 2002: NDSM (National Defence Service Medal); February 2004: AAM (Army Achievement Medal); November 2002: ASR (Army Service Ribbon); 2003: GWOTM (Global War in Terrorism Medal); 2003: AESM (Army Expeditionary Service Medal); and 2004: OSR (Overseas Service Ribbon).

42. Therefore, even with 25 years of experience in the HR field, almost 11 years seniority with Defendant, a history of dedicated and loyal service with Defendant, numerous awards from the U.S. Army and more than enough HR qualifications and skills, Plaintiff was eliminated instead of the other two younger, non-disabled, and non-Middle Eastern individuals who now hold the title of "HR Manager."

43. Defendant claims that Plaintiff's job was eliminated because of "cost-saving" reasons; however, it is clear that the HR Generalist positions that Plaintiff and Brown held before October 1, 2021 were simply given a title change (to HR Manager) and Plaintiff was replaced in his role by a young black, American male (who started employment just one day before Plaintiff was informed he was being terminated).

44. Plaintiff believes and therefore avers that he was subjected to a hostile work environment, not retained by Defendant and thus ultimately terminated from his employment with Defendant in violation of the ADA, FMLA, ADEA, Title VII and Section 1981.

**COUNT I**
**Violations of the Americans with Disabilities Act, as amended ("ADA")**
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Hostile Work Environment;**
**[3] Retaliation; [4] Failure to Accommodate)**

45. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

46. Plaintiff suffered from qualifying health conditions under the ADA (as amended), which (at times) affected his ability to perform some daily life activities (as discussed *supra*).

47. Plaintiff requested reasonable accommodations, including but not limited to intermittent and block medical leave.

48. In response to learning of Plaintiff's disabilities and requests/need for reasonable medical accommodations, Plaintiff was subjected to a hostile work environment through disparate treatment, pretextual admonishment, and discriminatory/retaliatory harassment (including failing to accommodate his disabilities by making him perform tasks outside of his physical limitations).

49. Plaintiff expressed concerns regarding Defendant's management's failure to accommodate his health conditions and their discriminatory treatment of him in advance of his ultimate termination, but no remedial action was taken.

50. In the months leading up to his separation, Plaintiff informed Defendant's management that he would be taking another medical leave in the near future to undergo bypass surgery (related to his disabilities).

51. During these aforesaid conversations, Plaintiff specifically informed Defendant's management that he would be undergoing bypass surgery once his wife was permitted to come to the U.S. under an immigration Visa.

52. Defendant's management was aware that Plaintiff's wife was coming to the U.S. the weekend of September 11, 2021 (and that as a result, he would be undergoing bypass surgery shortly thereafter).

53. On or about September 14, 2021 (just one day after a younger African American HR Manager with less skills and qualifications than Plaintiff began his employment with

Defendant), Plaintiff was informed by Defendant that he was being terminated from his employment due a restructuring and that his termination date would be effective October 1, 2021.

54. Defendant claims that Plaintiff's job was eliminated because of "cost-saving" reasons; however, it is clear that the HR Generalist positions that Plaintiff and Brown held before October 1, 2021 were simply given a title change (to HR Manager) and Plaintiff was replaced in his role by a young black, American male (who started employment just one day before Plaintiff was informed he was being terminated).

55. Plaintiff believes and therefore avers that his known disabilities, perceived disabilities; and/or his record of impairment were motivating or determinative factor[s] in Defendant's decisions to (a) terminate his employment; (b) not retain Plaintiff as an "HR Manager;" and/or (c) not accommodate Plaintiff's medical leave (by terminating him shortly before Plaintiff would have taken a medical leave of absence under the ADA to undergo bypass surgery).

56. Plaintiff also believes and therefore avers that he was terminated from his employment with Defendant and/or not retained by Defendant as an "HR Manager" because of his protected activity under the ADA (which constitutes unlawful retaliation).

57. These actions as aforesaid constitute violations of the ADA, as amended.

## COUNT II
## Family and Medical Leave Act ("FMLA")
### (Interference and Retaliation)

58. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

59. Plaintiff was an eligible employee under the definitional terms of the FMLA, 29 U.S.C. § 2611(a)(i)(ii).

60. Plaintiff requested leave from Defendant, his employer, with whom he had been employed for at least twelve months pursuant to the requirements of 29 U.S.C.A § 2611(2)(i).

61. Plaintiff had at least 1,250 hours of service with the Defendant during his last full year of employment (pre-FMLA leave request).

62. Defendant is engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

63. Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of FMLA on a block or intermittent basis.

64. Defendant committed interference and retaliation violations of the FMLA by *inter alia*: (1) considering Plaintiff's FMLA leave/needs in making the decision to terminate him; (2) terminating Plaintiff's employment in retaliation for requesting and/or utilizing FMLA leave; (3) terminating Plaintiff's employment in order to prevent him from using FMLA leave in the future; and/or (4) taking actions towards him that would dissuade a reasonable person from exercising his rights under the FMLA.

65. Plaintiff believes and therefore avers that his requests and/or utilization of FMLA were motivating or determinative factor[s] in Defendant's decisions to (a) terminate his employment; and/or (b) not retain Plaintiff as an "HR Manager."

66. These actions as aforesaid constitute both interference and retaliation violations of the FMLA.

**COUNT III**
**Violations of the Age Discrimination in Employment Act ("ADEA")**
**(Age Discrimination)**

67. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

68. Plaintiff believes and avers that he was subjected to a hostile work environment and ultimately terminated and/or not retained as an HR Manager because of his advanced age.

69. Defendant claims that Plaintiff's job was eliminated because of "cost-saving" reasons; however, it is clear that the HR Generalist positions that Plaintiff and Brown held before October 1, 2021 were simply given a title change (to HR Manager) and Plaintiff was replaced in his role by a young male (who started employment just one day before Plaintiff was informed he was being terminated).

70. These actions as aforesaid constitute unlawful retaliation under the ADEA.

**COUNT IV**
**Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")**
**([1] Race/National Origin Discrimination; [2] Hostile Work Environment; [3] Retaliation)**

71. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

72. Plaintiff was subjected to a hostile work environment through disparate treatment, pretextual admonishment, discriminatory comments and/or demeaning treatment during his employment with Defendant in the United States because of his race/national origin and/or his complaints about race/national origin discrimination.

73. While Plaintiff expressed concerns of racial/national origin discrimination to Defendant's management on several occasions in advance of his termination, no proper investigation was done and no remedial action was taken.

74. Instead, on or about September 14, 2021 (just one day after a younger African American HR Manager with less skills and qualifications than Plaintiff began his employment

15

with Defendant), Plaintiff was informed by Defendant that he was being terminated from his employment due to a restructuring and that his termination date would be effective October 1, 2021.

75. Defendant claims that Plaintiff's job was eliminated because of "cost-saving" reasons; however, it is clear that the HR Generalist positions that Plaintiff and Brown held before October 1, 2021 were simply given a title change (to HR Manager) and Plaintiff was replaced in his role by a young black, American male (who started employment just one day before Plaintiff was informed he was being terminated).

76. Plaintiff believes and therefore avers that his race and/or national origin was a motivating or determinative factor in Defendant's decisions to (a) terminate his employment; and/or (b) not retain Plaintiff as an "HR Manager."

77. Plaintiff also believes and therefore avers that he terminated and/or not retained as an HR Manager in retaliation for engaging in protected activity under Title VII.

78. These adverse actions taken against Plaintiff on account of his race/national origin and/or complaints of discrimination constitute violations of Title VII.

## COUNT V
## Violations of 42 U.S.C. § 1981
([1] Race Discrimination[2]; [2] Retaliation)

---

[2] *See e.g. Smith v. Specialty Pool Contractors*, 2008 WL 4410163, at *4 (W.D. Pa. 2008)(In accordance with Supreme Court jurisprudence, "persons of Jewish ancestry are a distinct race and, therefore, within the protection of 42 U.S.C. § 1981," citing, *St. Francis College v. Al-Khazraji,* 481 U.S. 604, 611-13 (1987))." It is also **well established** that Section 1981 prohibits racial discrimination based upon one's race/ancestry because of his or her linguistic characteristics. In *Chandoke v. Anheuser-Busch, Inc*., 843 F. Supp. 16, 18-20 (D.N.J. 1994), the court explained that Indian ancestry is protected under Section 1981 and that accents relate to not only national origin discrimination ***but also racial discrimination***. *See also Gupta v. Sears, Roebuck & Co*., 2007 WL 2253609, at *3 (W.D. Pa. 2007)(denying motion to dismiss because the plaintiff adequately pleaded Indian ancestry, which is a race, and a discernable accent as to claims under Section 1981); *Saleh v. Upadhyay*, 11 Fed.Appx. 241 (4th Cir. 2001)(Affirming a trial verdict in favor of a plaintiff asserting for, among other claims, a claim under 42 U.S.C § 1981 for discrimination because of his accent; *Lopez v. Indiana-Kentucky Elec. Corp*., 2006 WL 3247892 (S.D. Ind. 2006)(denying summary judgment on plaintiff's Section 1981 claim due to hostility towards his Spanish accent); *Minetos v. City University of*

79. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

80. Plaintiff was subjected to a hostile work environment through disparate treatment, pretextual admonishment, discriminatory comments and/or demeaning treatment during his employment with Defendant in the United States because of his race and/or his complaints about race discrimination.

81. While Plaintiff expressed concerns of racial discrimination to Defendant's management on several occasions in advance of his termination, no proper investigation was done and no remedial action was taken.

82. Instead, on or about September 14, 2021 (just one day after a younger African American HR Manager with less skills and qualifications than Plaintiff began his employment with Defendant), Plaintiff was informed by Defendant that he was being terminated from his employment due to a restructuring and that his termination date would be effective October 1, 2021.

---

*New York*, 875 F.Supp. 1046 (S.D. N.Y. 1995)(Hispanic secretary with college's music department stated a Section 1981 cause of action by alleging that she was not allowed to be head secretary because she had a Hispanic accent); *Ortiz v. Bank of America*, 547 F.Supp. 550 (D.Cal. 1982)(Puerto Rican asserting employment discrimination because of accent states cause of action under Section 1981); *Nedeltchev v. Sheraton St. Louis City Center Hotel & Suites*, 335 Fed.Appx. 656 (8th Cir. 2009)(finding European Slavic plaintiff states a cause of action under Section 1981 for harassment because of his ancestry and accent); *Saleh v. Upadhyay*, 11 Fed.Appx. 241 (4th Cir. 2001)(affirming verdict for Nigerian born professor under Section 1981 for among other things, discrimination against his accent); *Mavrommatis v. Carey Limousine Westchester*, *Inc*., WL 2976925 (D.Conn. 2010)(holding 1981 claim satisfied by discrimination because of accent but dismissing case on other grounds); *Rumala v. New York City Transit Auth*., 2005 WL 2076596, *8-*9 (E.D.N.Y. 2005)(construing complaint as one of ancestry, as well as national origin, when plaintiff's claims included alleged discriminated based on an alleged accent); *Franchitti v. Bloomberg, L.P.*, 2004 WL 2366183, *2-*4 (S.D.N.Y. 2004) (inferring that § 1981 claim was based on ancestry when plaintiff's accent was one of the alleged bases for discrimination).

83. Defendant claims that Plaintiff's job was eliminated because of "cost-saving" reasons; however, it is clear that the HR Generalist positions that Plaintiff and Brown held before October 1, 2021 were simply given a title change (to HR Manager) and Plaintiff was replaced in his role by a young black, American male (who started employment just one day before Plaintiff was informed he was being terminated).

84. Plaintiff believes and therefore avers that his race was a motivating or determinative factor in Defendant's decisions to (a) deny him advancement opportunities; (b) issue him negative performance evaluations; (c) terminate his employment; and/or (d) not retain Plaintiff as an "HR Manager."

85. Plaintiff also believes and avers that he was terminated and/or not retained in retaliation for engaging in protected activity under Section 1981.

## COUNT VI
### Violations of the Pennsylvania Human Relations Act

86. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

87. Plaintiff's claims under Title VII, §1981, the ADA and the ADEA are construed virtually identically with the PHRA. Kelly v. Drexel Univ., 94 F.3d 102, 106 (3d Cir. 1996).

88. The actions alleged herein as being violative of Title VII, §1981, the ADA and the ADEA are also violations of the PHRA.

89. Plaintiff has suffered damages as set forth more fully herein.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's

illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

B. Plaintiff is to be awarded punitive and/or liquidated damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

C. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering);

D. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: */s/ W. Charles Sipio*
W. Charles Sipio, Esq.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: November 1, 2022